UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **AMERICAN CENTER FOR LAW AND JUSTICE,**<br><br>Plaintiff,<br><br>v.<br><br>**U.S. DEPARTMENT OF HOMELAND SECURITY,** *et al.*,<br><br>Defendants. | Case No. 1:21-cv-01364 (TNM) |

### MEMORANDUM OPINION

Court dockets in this district overflow with Freedom of Information Act (FOIA) matters. Many of those cases seek reams of records, requiring massive efforts from defendant agencies. Despite the at times Sisyphean effort to respond, agencies rarely object to the breadth of a request. But sometimes they do.

This is one of those cases. The American Center for Law and Justice (ACLJ) submitted a FOIA request to four agencies for responsive records about eight broadly defined immigration-related subject areas. When the agencies failed to timely respond, ACLJ sued. The agencies move to dismiss, arguing that ACLJ's underlying FOIA request was overbroad. The Court agrees and will dismiss the case.

### I.

The southern border occupies a prominent spot in our nation's public discourse. Border policies tend to fluctuate with each incoming administration. The Biden Administration is no different. After President Biden took office, he changed (sometimes wholesale) his predecessor's immigration policies. For example, the new administration stopped Operation

Talon, a program "aimed at removing convicted sex offenders" living illegally in the United States. Compl. Ex. 1 at 6, ECF No. 1-1.[1]

In early 2021, media outlets reported a surge of illegal migrants at the southern border. *See generally id.* at 2–9. This surge threatened to overload the country's immigration agencies. Some policymakers worried that terrorists might slip through in the mass migration. *See* Compl. Ex. 1 at 6 (statement of Rep. Katko). Indeed, media outlets reported that Customs and Border Protection (CBP) had caught two men listed on the FBI's Terrorist Watchlist. *See id.* at 8–9. Other policymakers worried that some migrants might contract COVID-19 in the overcrowded detention facilities and would carry the virus into the United States. *See id.* at 8. The media also reported that the Biden Administration refused to call the situation a "crisis," instead directing officials to use the word "challenge" when discussing the chaos. *See id.* at 2–3.

Enter ACLJ, which submitted a FOIA request to the Department of Homeland Security (DHS) and several of its daughter agencies: CBP, Immigration and Customs Enforcement (ICE), and U.S. Citizenship & Immigration Services (USCIS). The request sought "any and all records" about eight subjects:[2]

- Instructions from the Biden Administration to refer publicly to the migrant surge as a "challenge," not a crisis, *see* Compl. Ex. 1 at 10;

- Records of how many migrants remain in custody, how many of those have been released without a court date, and how many are convicted criminals. *See id.* at 11. More, any actions taken (1) to prevent trafficking of unaccompanied minors

---

[1] All page citations refer to the page numbers that the CM/ECF system generates, and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.

[2] ACLJ's request technically includes nine categories of information. But the seventh and eighth categories both discuss a CBP press release, with the former focused on Secretary Mayorkas and the latter focused on any other CBP, ICE, or USCIS official. *See* Compl. Ex. 1 at 12. In all other categories, ACLJ mentioned together Secretary Mayorkas and any other CBP, ICE, or USCIS official. So the request as a whole deals with eight subjects, not nine.

and women; (2) to stem the tide of migrants across the border; and (3) to protect Americans from migrants on various terror watch lists, *see id.* at 10–11;

- Instructions that DHS employees should not discuss the surge with the press, *see id.* at 11;

- Records of how many migrants have COVID-19, how many of those have been released into the nation, how the government is tracking those migrants, and how the government is lessening the rate of infection at migrant detention centers, *see id.*;

- Warnings from DHS staff that a quick repeal of the Trump Administration's border policies could lead to a surge at the southern border, *see id.* at 12;

- Cancellation of Operation Talon, *see id.*;

- An April 2021 CBP press release about the arrest of two migrants on the FBI's Terror Watch List and the removal of that press release from CBP's website, *see id.*; and

- Arrest or detention of any person at the border who is on the government's terrorism watch lists, *see id.* at 13.

ACLJ's request also specified that it sought records "sent from, prepared by, sent to, received by, reviewed by, or in any way communicated to or by, [DHS] Secretary Alejandro Mayorkas, his aides, staff, representative or agents, or acting predecessor, or any CBP, ICE, or USCIS official." *Id.* at 10–14. ACLJ limited the request to any records from November 4, 2020 "to the date this Request is processed." *Id.* at 10.

Both USCIS and CBP acknowledged ACLJ's request and invoked FOIA's provision allowing 30 days for the agency to respond. *See* 5 U.S.C. § 552(a)(6); Compl. Exs. C and D, ECF Nos. 1-3 and 1-4. But 30 days later, DHS and its daughter agencies still had not responded. So ACLJ sued, arguing that the agencies had violated FOIA.[3] *See* Compl. ¶¶ 25–41. The

---

[3] On the same day that ACLJ filed its Complaint, DHS acknowledged receipt of the request. *See* Defendants' Reply ("Defs.' Reply") Ex. 1, ECF No. 17-1.

3

agencies moved to dismiss that complaint. *See* Defs.' Motion to Dismiss ("Defs.' MTD"), ECF No. 15. That motion is now ripe.[4]

## II.

To survive a motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up). The plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, the Court "treat[s] the complaint's factual allegations as true and must grant the plaintiff the benefit of all inferences that can be derived from the facts alleged." *L. Xia v. Tillerson*, 865 F.3d 643, 649 (D.C. Cir. 2017) (cleaned up). The Court, however, need not credit legal conclusions couched as factual allegations. *See Iqbal*, 556 U.S. at 678.

FOIA exposes "agency action to the light of public scrutiny." *DOJ v. Reps. Comm. for Freedom of the Press*, 489 U.S. 749, 772 (1989). The Act requires an agency to release records not otherwise exempt from disclosure when the agency receives a request that "reasonably describes such records." 5 U.S.C. § 552(a)(3)(A). And a request "reasonably describes" agency records when it "would be sufficient [to enable] a professional employee of the agency who was familiar with the subject area of the request to locate the record with a reasonable amount of effort." *Truitt v. Dep't of State*, 897 F.2d 540, 545 n.36 (D.C. Cir. 1990).[5] "Agencies must read

---

[4] The Court has jurisdiction under 5 U.S.C. § 552(a)(4)(B) and 28 U.S.C. § 1331.

[5] FOIA also requires a request to be "in accordance with" an agency's FOIA regulations. 5 U.S.C. § 552(a)(3)(A). DHS rules incorporate the Act's "reasonably describes" requirement. *See* 6 C.F.R. § 5.3(b) ("Requesters must describe the records sought in sufficient detail to enable DHS personnel to locate them with a reasonable amount of effort."). The Court thus need not analyze whether ACLJ's request violates DHS regulations. If the request violates FOIA's "reasonably describes" requirement, it also violates those regulations. *See Freedom Watch, Inc. v. Dep't of State*, 925 F. Supp. 2d 55, 60 n.1 (D.D.C. 2013).

4

FOIA requests as drafted," *Miller v. Casey*, 730 F.2d 773, 777 (D.C. Cir. 1984), and "[b]road, sweeping requests lacking specificity are not sufficient." *Dale v. IRS*, 238 F. Supp. 2d 99, 104 (D.D.C. 2002).

### III.

### A.

Congress enacted FOIA in 1966 to "assure public access to all governmental records whose disclosure would not significantly harm specific governmental interests." *Dep't of Air Force v. Rose*, 425 U.S. 352, 362–65 (1976). FOIA has ably served the public interest, checking government corruption and "hold[ing] the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1978). But those benefits are not costless, especially as agency records have multiplied in recent decades with the ubiquity of computers.

To see why, some background is necessary. FOIA allows members of the public to request "agency records" and to go to court for responsive records if the agency withholds them. 5 U.S.C. § 552(a)(4)(B); *see Kissinger v. Reps. Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980). As one might guess, requestable agency communications for much of FOIA's fifty years were in paper form. *See, e.g.*, *Kissinger*, 445 U.S. at 140 (analyzing whether paper transcripts qualified as "agency records").

That began to change in the mid-1980s when some agencies started using email. *See, e.g.*, *Armstrong v. Exec. Off. of the President*, 1 F.3d 1274, 1279 (D.C. Cir. 1993). With email came an explosion of agency records. Discussions among agency employees now occurred in a medium that generated records which could be located and searched, rather than during phone calls or unrecorded meetings. Since then, email has only expanded in use, dramatically boosting the amount of potential records to which a FOIA requester might be entitled and, by extension,

the amount of agency time needed to find all responsive records.  *See* Melanie Ann Pustay, *Memorandums to Messages: The Evolution of FOIA in the Age of the Internet*, 126 Yale L.J. F. 252 (2016) ("The proliferation of records can make locating and processing responsive material incredibly time-consuming.").  To make matters tougher for agencies, they must respond to any request within at most 30 days.  5 U.S.C. § 552(a)(6)(A)(i), (a)(6)(B)(iii).  Surprising no one, agencies often miss that deadline.  According to the Justice Department, agencies in Fiscal Year 2020 spent on average 30.23 days to respond to "simple" requests.[6]  And over half of "complex" requests—which are requests that seek records from multiple locations—required more than 40 days for the agency to process.[7]

In that sense, FOIA has not evolved with the realities and technologies of government operations.  Thanks to email, today's agencies must search through more records than ever to find responsive ones.  And they must respond to a deadline enacted 25 years ago, well before email's proliferation in the American workplace.  *See* Electronic Freedom of Information Act Amendments of 1996, Pub. L. No. 104-231, § 8(b), 110 Stat. 3048, 3052 (1996).[8]  Failure to meet that deadline brings courts into the fray.  *See Citizens for Resp. and Ethics in Wash. v. FEC*, 711 F.3d 180, 185 (D.C. Cir. 2013) ("If the agency does not make a determination within the relevant statutory time period, the requester may file suit without exhausting administrative appeal remedies.").

As outstanding requests pile up at agencies, so do FOIA cases on court dockets.  Judges in this district currently have 991 active FOIA cases, which represent almost a quarter of the

---

[6] *See* Dep't of Justice, *Summary of Annual FOIA Reports for Fiscal Year 2020* at 12, located at https://www.justice.gov/oip/page/file/1393381/download.

[7] *See id.* at 13.

[8] Admittedly, most agencies probably used email in 1996, but not to the same extent as today.

district's entire civil docket.⁹  And many of those take years to resolve.  *See, e.g.*, *Reps. Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 359 (D.C. Cir. 2021) (resolving a FOIA dispute seven years after the plaintiff had originally filed its FOIA request); *McGehee v. U.S. Dep't of Just.*, 362 F. Supp. 3d 14, 16 (D.D.C. 2019) ("In 1998, the Indianapolis Colts drafted Peyton Manning, Britney Spears released her hit single "Baby One More Time," and Fielding McGehee submitted a [FOIA] request to the FBI.  While the heydays of Mr. Manning and Ms. Spears have come and gone, Mr. McGehee's FOIA request lingers.").

Nonprofit FOIA plaintiffs create much of that backlog.  FOIA generously allows requests and suits by "any person," meaning anyone opposed to an agency's mission or policies can use FOIA requests to "dig up dirt on the policy and the people behind it."  David E. Pozen, *Freedom of Information Beyond the Freedom of Information Act*, 165 U. Pa. L. Rev. 1097, 1127 (2017).  Nonprofit organizations dedicated to certain causes or policies often march in the vanguard of such objectors and thus "employ similar tactics, backed up by a continuous succession of FOIA lawsuits."  *Id.*

And nonprofits are doing so at an increasing rate.  According to Syracuse University's FOIA Project, nonprofits accounted for 56% of all FOIA lawsuits filed nationwide in 2018, compared to just 14.2% in 2001.¹⁰  And of those nonprofit plaintiffs, many are repeat litigants.  From 2001–2018, plaintiffs with one FOIA lawsuit accounted for only 15% of all FOIA suits by nonprofits.  The other 85% can be explained by nonprofit requesters who bring more than one

---

⁹ Statistics based on district-wide case filing system as of November 9, 2021.

¹⁰ For the statistics that appear in this paragraph, see *FOIA Suits Filed by Nonprofit/Advocacy Groups Have Doubled Under Trump*, The FOIA Project (Oct. 18, 2018), http://foiaproject.org/2018/10/18/nonprofit-advocacy-groups-foia-suits-double-under-trump/.

FOIA lawsuit.  The implication is clear:  as more nonprofits file FOIA suits, some nonprofits file a disproportionate number of them.

The civil docket in this district features some of these frequent flyers.  For example, ACLJ has 12 pending FOIA cases before judges here.  As of this writing, American Oversight has 74 active FOIA cases, Judicial Watch has 63, Citizens for Responsibility and Ethics in Washington has 27, the Center for Biological Diversity has 15, and the Democracy Forward Foundation has 14.[11]

To be sure, nonprofits have plenty of reason to file FOIA requests and to pursue those requests through litigation.  Some might oppose the political party in charge of government and thus use FOIA requests to focus on policies that receive comparatively little attention elsewhere.  More, nonprofits might view FOIA requests as necessary to the nonprofit's specific mission.  No one could deny those motivations as reasons for a robust FOIA practice by nonprofits.  But FOIA itself offers nonprofits additional inducements to sue.

*First*, the Act limits what an agency can charge noncommercial requesters to cover the costs of any search and response.  *See* 5 U.S.C. § 552(a)(4)(A)(ii)(II) ("[F]ees shall be limited to reasonable standard charges for document duplication when records are not sought for commercial use and the request is made by an educational or noncommercial scientific institution . . . .").  Requesters can even waive payment of *any* fees if the request "is not primarily in the commercial interest of the requester."  *Id.* § 552(a)(4)(A)(iii).  Because nonprofit organizations by definition have no commercial interests, they will usually qualify for a fee waiver, lowering the barrier to filing a FOIA request in the first place.  *See Jud. Watch, Inc. v.*

---

[11]  All statistics current as of November 9, 2021.

*Rossotti*, 326 F.3d 1309, 1312 (D.C. Cir. 2003) ("Congress amended FOIA to ensure that it be liberally construed in favor of waivers for noncommercial requesters.") (cleaned up).

*Second*, FOIA requesters may receive attorney's fees if they "substantially prevail[]" in the ensuing litigation. 5 U.S.C. § 552(a)(4)(E). As the D.C. Circuit has observed, that provision by design encourages requesters to seek judicial review of an agency's response. *See Davy v. CIA*, 550 F.3d 1155, 1158 (D.C. Cir. 2008) ("A grudging application of this provision, which would dissuade those who have been denied information from invoking their right to judicial review, would be clearly contrary to congressional intent.") (cleaned up).

Thanks to these two provisions, nonprofit requesters have little to lose when they file a FOIA lawsuit. And much to gain. Both provisions also encourage broadly worded requests. With no fees forcing a nonprofit to internalize the cost of its request, it would have little reason not to request a broader universe of documents. And the odds of an insufficient agency response—and by extension the odds of prevailing in later litigation—increase as the request expands in scope and the agency risks overlooking responsive documents.

The mismatched incentives are clear. Nonprofit litigants like ACLJ have everything to gain and little to lose from posing broad, complicated FOIA requests. Agencies, deprived of fees for their FOIA services, have little reason to prioritize FOIA requests over their other statutory duties. Combine that with the recent explosion of nonprofit FOIA requests, and the agency will fall further and further behind in processing requests. And when the nonprofit requester sues for an overdue response, the parties can endure years of litigation, with the agency ultimately footing the bill. This is the system Congress hath wrought. And which this Court must dutifully implement.

**B.**

But even in the above-described environment, this case is an outlier. ACLJ requested "any and all records, communications, or briefings" on eight subjects. The phrase "any and all" is capacious, involving a huge number of potentially responsive documents. But requests for all documents are neither inherently unreasonable nor uncommon. *See Yeager v. DEA*, 678 F.2d 315, 326 (D.C. Cir. 1982) ("the number of records appears to be irrelevant to the determination whether they have been reasonably described"). ACLJ seizes on this point and touts it to suggest the narrowness of its request. *See* Plaintiff's Opposition to Motion to Dismiss ("Opp'n") at 17, ECF No. 16 ("Indeed, the essence of Defendants' Motion to Dismiss seems to be their dislike of the 'any and all.'"). But the request includes other language, all of which broadens it beyond the bounds of reasonableness.

ACLJ sought documents "referencing or regarding in any way" eight topics. *See* Compl. Ex. 1 at 10–13. A request for documents that merely "reference" certain topics might not be unreasonable. In that scenario, responsive documents could probably be found with a simple keyword search across agency databases. But ACLJ's request goes further. It also seeks documents that "regard[] in any way" the eight specified topics. That is a much broader request. *See Shapiro v. CIA*, 170 F. Supp. 3d 147, 155 (D.D.C. 2016) ("[T]here is a difference in kind between requests for documents that 'mention' or 'reference' a specified person or topic and those seeking records 'pertaining to,' 'relating to,' or 'concerning' the same.").

Such expansive phrasing would sweep in any communication "even remotely related" to the eight categories being requested. Defs.' MTD at 15. Consider some examples. An email between Border Patrol agents about a migrant who might have COVID-19 (but also might not) could qualify as a record pertaining to "the number of migrants with COVID." Compl., Ex. 1 at

10

11.  And one might think a briefing to Border Patrol agents on COVID-19 avoidance to "regard[] or referenc[e]" the number of migrants with COVID, given how many migrants the agents encounter every day.  Or consider a message between USCIS and DHS about a sex offender who entered the country illegally.  ACLJ would have a viable argument that, depending on when the letter was sent, it could "regard" in some way the cancellation of Operation Talon, which might have otherwise snagged that criminal.  *Id.* at 12.  Finally, as the Government points out, a record need not even discuss a detention at the border to still relate "in any way" to "the arrest or detention of any person at the U.S. Border who is on any government terror-related or no-fly watch list."  Defs.' MTD at 16.

Those broad descriptions do not allow the agency "to determine precisely what records are being requested." *Tax Analysts*, 117 F.3d 607, 610 (D.C. Cir. 1997) (quoting *Kowalczyk v. Dep't of Just.*, 73 F.3d 386, 388 (D.C. Cir. 1997)).  Indeed, they leave the unfortunate FOIA processor assigned to such a case in a hopeless muddle without clear guidance about what documents are being sought.  Courts in this district have dismissed similarly worded requests on the same basis.  *See, e.g.*, *Cable News Network v. FBI*, 271 F. Supp. 3d 108, 112 (D.D.C. 2017) (dismissing as overbroad a request for records that "relate in any way to" certain subject areas); *Dale*, 238 F. Supp. 2d at 104 (finding request for documents "that refer or relate in any way to" subject matter did not reasonably describe records sought).

ACLJ responds with a circular statement that those cases "rejected FOIA requests that were inherently vague and overbroad because they were vague and overbroad."  Opp'n at 17.  The Court disagrees—those cases involved requests for documents that relate "in any way" to certain topics.  ACLJ offers no meaningful way to distinguish those requests from ACLJ's identically worded one here.

The scope of ACLJ's request also would require more than a "reasonable amount of effort" to find responsive documents. *See Truitt*, 897 F.2d at 545, n.36. ACLJ requested records that were "sent from, prepared by, sent to, received by, reviewed by, or in any way communicated to or by" the DHS Secretary and his "aides, staff, representative or agents, or acting predecessor, or any other CBP, ICE, or USCIS official." Compl. Ex. 1 at 10. The population of the Secretary's "representative or agents" encompasses each of the Department's 240,000 employees.[12] They all carry out policy directives as pronounced by him. *See Representative*, Black's Law Dictionary (11th ed. 2019) ("Someone who stands for or acts on behalf of another.").

ACLJ counters that, because the request lists "aides" and "staff" before "representative or agents," the request is therefore limited to an identifiable group of DHS employees: those closest to the Secretary. *See* Opp'n at 11. But the Court, like the agency, must read the request as drafted, not as ACLJ "might wish it was drafted," *Miller*, 730 F.2d at 777, and the request specifically includes the Secretary's "representative and agents." If ACLJ had intended to include only the Secretary's immediate staff, it should have said so from the start. And ACLJ's decision to include groups beyond "aids" and "staff" strongly suggests it thought this subset of DHS employees was insufficient.

In any event, the request also applies to communications by "*any* other CBP, ICE, or USCIS official." Compl. Ex. 1 at 10 (emphasis added). ACLJ does not try to cabin this language to particular employees at those agencies. Nor could it. Anyone employed at those agencies would qualify as an "official." *See Official*, Black's Law Dictionary (11th ed. 2019) ("Someone who holds or is invested with a public office."). Every employee at these three

---

[12] For the number of DHS employees, see Defs.' MTD at 16.

sprawling agencies would therefore be implicated by ACLJ's request, including those that have nothing to do with the border.

For example, USCIS adjudicates visa petitions. An email about a visa petitioner who contracted COVID-19 would qualify as a record "referencing or regarding in any way . . . the number of migrants with COVID," even though the USCIS visa officer has no responsibility or involvement with the southern border. Compl. Ex. 1 at 11. ACLJ has thus failed to limit its search to anyone who "might have had something to do" with the issue that prompted the requests. *Freedom Watch*, 925 F. Supp. 2d at 61. That failure reinforces the unreasonably broad nature of ACLJ's request. *See AFGE v. Dep't of Com.*, 907 F.2d 203, 209 (D.C. Cir. 1990) (rejecting FOIA requests as overly broad when the burden of the search was "largely unnecessary to the [requester's] purpose").

Finally, ACLJ's request is not at all limited to certain records. The request instead defines "record" as "any information that qualifies under [FOIA] and includes, but is not limited to, the original or any full, complete, and unedited copy" of 19 types of written communication. Compl. Ex. 1 at 9. "Briefing" has a similarly capacious definition, "includ[ing], but [ ] not limited to, any in-person meeting, teleconference, electronic communication, or other means of gathering or communicating by which information was conveyed to more than one person." *Id.* at 10. Such descriptions are not uncommon in a FOIA request. Yet when paired with ACLJ's other language, they only further broaden ACLJ's request.

To be sure, ACLJ limited its request in one regard. It sought records from only November 4, 2020 to May 18, 2021. *See* Compl. Ex. 1 at 10. Although that temporal limitation is important, it does not change ACLJ's use of broad language to identify the records sought nor the applicability of that language to all DHS employees. Consider: a request for a week's worth

of all records about President Biden would be significantly vaguer and broader than a similarly worded request for a month's worth of records about his public statements on the Supreme Court. A shorter timeframe does not necessarily cure an overly broad description of the records. And the description is what matters. *See* 5 U.S.C. § 552(a)(3)(A) (agency must respond to a FOIA request that "reasonably describes" the requested records); *see also Machado Amadis v. Dep't of State*, 971 F.3d 364, 370 (D.C. Cir. 2020) ("Agencies must read FOIA requests as drafted."). ACLJ's descriptions here are too broad to describe, much less "reasonably," the records requested. *Id.*

The Court thus agrees with the Government that any search responsive to the plain language of ACLJ's request would require, at a minimum, a review of communications by "any and all employees" at three agencies (ICE, CBP, and USCIS) that might be "remotely related" to ACLJ's eight categories, "without any limitation on the method or form of communication." Defs.' MTD at 15. And recall that all DHS employees would likely need to be included. That type of search would be "unduly burdensome," *see Goland v. CIA*, 607 F.2d 339, 353 (D.C. Cir. 1978), and would be a "massive undertaking," *see Nat'l Sec. Cnslrs. v. CIA*, 969 F.3d 406, 410 (D.C. Cir. 2020). The agency need not respond to such a request. *See AFGE*, 907 F.2d at 208–09; *Krohn v. DOJ*, 628 F.2d 195, 198 (D.C. Cir. 1980) (holding as overly broad a FOIA request that would have required review of "each and every . . . criminal case in order to determine whether it contains any evidence of the data" requested) (cleaned up).

ACLJ responds by comparing its request to one at issue in a previous case. *See* Opp'n at 9–10. In *Freedom Watch v. Department of State*, 925 F. Supp. 2d 55 (D.D.C. 2013), the court held that the plaintiff's requests for "all records that refer or relate" to 63 categories of records did not reasonably describe the records being sought. *Id.* at 56, 61–62. The plaintiff there

requested all records relating or referring to "any and all communications to or from President Obama, his administration, or the White House in general" about China. *Id.* at 61. ACLJ argues that because its request is less broad than those in *Freedom Watch*, the Court should reach an opposite result. *See* Opp'n at 10.

Not so. Decisions from a district court do not create a floor for what a FOIA request must do to pass muster. To say that ACLJ's request is narrower than in another case does not answer whether ACLJ's request here meets FOIA's requirements.

In any event, ACLJ overlooks obvious similarities between its request and those in *Freedom Watch*. Both requests sweep in employees who do not deal with the particular issue named in the request. *See id.* at 61 ("Aside from the clarity of 'President Obama,' the request did not in any limit the scope of 'his administration' or 'the White House in general' to those persons, for instance, who might have had something to do with China . . . ."). And the plaintiff in *Freedom Watch* requested all records that "refer[red] or relate[d]" to a particular category— language much like ACLJ's request, which adds the expansive phrase "in any way" to its descriptions of the requested records. *See id.* at 57. To be sure, the requests in *Freedom Watch* dealt with 63 categories of records, not eight. But the near-identical language in the requests makes the two cases much closer than ACLJ believes.

ACLJ also argues that the Government cannot move to dismiss a FOIA request without first coordinating with the plaintiff to narrow the request. *See* Opp'n at 9, 11–12, 17. ACLJ's brief cites no authority for that proposition, relying instead on the author's "years of practicing." *Id.* at 12. With respect, counsel's experience does not matter. A request by the Government to narrow the scope of a FOIA request might be "permissible." *Id.* at 8 (quoting *Rugiero v. DOJ*, 257 F.3d 534, 538 (6th Cir. 2001)). It might even be preferable. But nothing in FOIA requires

such an action.  That agencies have negotiated the scope of past requests does not graft a new requirement onto FOIA's express terms.[13]  ACLJ cites no authority to the contrary, nor is the Court aware of any.

In sum, ACLJ has not "reasonably described" the requested records.  ACLJ could have done so—for example, it could have limited the request to members of the Secretary's office or to documents referencing fewer subjects.  But ACLJ is the master of its request and instead chose to include broad language encompassing many other employees and documents.  The Court must read that request as drafted.  *See Amadis*, 971 F.3d at 370.

\*   \*   \*

FOIA provides an important check against the abuses of government.  Nonprofits have wielded FOIA in that laudable spirit, often to positive effect for all concerned about how government operates.  But FOIA also encourages the same nonprofits requesters to push further.  And many have, some persistently.  Those incentives breed requests like this one—imposing crushing burdens on limited agency resources with no clear scope or result.  FOIA envisions that applicants will reasonably describe the records they seek, and agencies are entitled to demand it.

### IV.

For these reasons, Defendants' Motion to Dismiss will be granted.  ACLJ's Complaint will be dismissed without prejudice.  A separate Order will issue.

Dated: November 10, 2021                    TREVOR N. McFADDEN, U.S.D.J.

---

[13]  ACLJ also fails to mention DHS's accommodating response to the request.  Although DHS did not negotiate to narrow, it did invite ACLJ to "resubmit [the] request containing a reasonable description of the records."  Defs.' Reply, Ex. 1 at 3.